MICHAEL SATRIS, SBN 67413
MARGARET LITTLEFIELD, SBN 110938
Law Offices of Michael Satris
P. O. Box 337
Bolinas, California  94924
Tel:  (415) 868-9209
Fax: (415) 868-2658
email:  satris@earthlink.net

Attorneys for Petitioner James Carlin

ORIGINAL
FILED

JUL - 3 2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA



C 06    4145    SI

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District: Northern |
|---|---|
| Name (under which you were convicted):<br><br>James Carlin | Docket or Case No.: |
| Place of Confinement:<br><br>California State Prison, San Quentin | Prisoner No.:<br><br>C-22727 |
| Petitioner (include the name under which you were convicted)<br><br>James Carlin                     v. | Respondent (authorized person having custody of petitioner)<br><br>Robert Wong, Acting Warden |
| The Attorney General of the State of | California |

## PETITION

This petition challenges the State of California's refusal to parole Petitioner James Carlin

("Carlin") from his indeterminate life sentence.  Carlin thus has revised and simplified the

standard form for a petition, which is designed for challenges to State custody on the basis that

the judgment is invalid, to focus on his challenge to State custody that acknowledges the validity

of the criminal judgment but challenges the lawfulness of the State's execution of that judgment.

In the event that the Court requires more information than provided by this petition, Carlin

requests that the Court permit filing of this petition and grant him leave to amend the petition

with any further information the Court may specify be furnished.

1.    (a) Name and location of court that entered the judgment of conviction leading to your commitment to

       prison on an indeterminate sentence up to life:     Superior Court, County of San Francisco

       (b) Criminal docket or case number:                 No. 102684

2.    (a) Date of the judgment of conviction:              September 5, 1980

       (b) Date of sentencing:                             October 24, 1980

3.    Length of sentence:                                  15 Years to Life consecutive to two-year
                                                           determinate for use of firearm

4.    In this case, were you convicted on more than one count or of more than one crime:

                    ☐ Yes                 ☑ No

5.    Identify all crimes of which you were convicted in this case and the sentence for each conviction:

           Murder, Second Degree (Cal. Pen. Code §§ 187, 190), 15 Years to Life
           Use of Firearm (Cal. Pen. Code § 12022.5), two years determinate,
           consecutive already served

6.    (a) What was your plea?  (Check one)

                    ☑ (1)  Not guilty          ☐ (3)  Nolo contendere (no contest)

                    ☐ (2)  Guilty              ☐ (4)  Insanity plea

       (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what

       did you plead guilty to and what did you plead not guilty to?              N/A

       (c) If you went to trial, what kind of trial did you have?  (Check one)

                    ☑ Jury                 ☐ Judge only

7.    Have you previously filed any petition, application, or motion challenging the State's refusal to parole you

       from the sentence imposed pursuant to this judgment of conviction in any state courts:

                    ☑ Yes                 ☐ No

8.    If your answer to the previous question was "Yes," please set forth the procedural history of the first

       petition you filed, including each court level at which it was considered, and give the following information

       for each court level:

AO 241
(Rev. 12/04)
(Further Revised by Law Office of Michael Satris for Challenge to Parole Denial)                                      Page# 3

(a ) First Court Level:

      (1) Name of court:                        Superior Court, County of San Francisco

      (2) Docket or case number:         4917, 5028

      (3) Date of filing:                     August 26, 2004, and January 27, 2005

      (4) Nature of the proceeding:      Petition for Writ of Habeas Corpus

      (5) Grounds raised:

          Board of Prison Terms' December 15, 2003, denial of parole to Carlin, convicted of a second degree murder that occurred in 1980, violated due process because arbitrarily misapplied state statute governing liberty, lacked individualized consideration, decisionmaker biased against granting of parole in violation of governing statute that provides a presumption that parole will be granted at the initial hearing, and unsupported by some evidence. Decision violates due process because based on stale, unchanging circumstances of the commitment offense when Carlin had an excellent, long record of rehabilitation; and the Board has retroactively increased the punishment for Carlin's offense. In addition the foregoing imposes cruel and unusual punishment on Carlin; added ground of untimely subsequent hearing in January 27, 2005, filing.

      (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

        ☐ Yes                ☒ No

      (7) Result (attach a copy of the court's opinion or order, if available):

          Petition Denied (Orders attached)

      (8) Date of result:  December 14, 2004, and March 24, 2005

(b) Next Court Level.

      (1) Name of court:                        Court of Appeal
                                            First Appellate District, Division Four

      (2) Docket or case number:         A111328

      (3) Date of filing:                     September 9, 2005

      (4) Nature of the proceeding:      Petition for Writ of Habeas Corpus

(5) Grounds raised:                   Same as in trial court

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes                    ☑ No

(7) Result (attach a copy of the court's opinion or order, if available):

(8) Date of result:                   September 15, 2005

(c) Next Court Level:

(1) Name of court:                    California Supreme Court

(2) Docket or case number:            S137548

(3) Date of filing:                   September 26, 2005

(4) Nature of the proceeding:         Petition for Review

(5) Grounds raised:                   Same as in lower courts

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes                    ☑ No

(7) Result (attach a copy of the court's opinion or order, if available):

Petition Denied (Order attached)

(8) Date of result:                   December 14, 2005

9.      Did you file any other petition, application, or motion challenging the State's refusal to parole you?:

☐ Yes                    ☑ No

10.     If your answer to the previous question was "Yes," please set forth the procedural history of the second

petition you filed, including each court level at which it was considered, and give the following information

for each court level:          N/A

11.     Please identify any further challenges filed in state court to the State's refusal to parole you, and for each

such challenge provide the information requested above for the earlier challenges.          N/A

12.    Did you appeal to or otherwise seek relief in the highest state court having jurisdiction over the action taken

        on your petition, application, or motion?

                    ☑ Yes                    ☐ No

        If you did not appeal to the highest state court having jurisdiction, explain why you did not:        N/A

13.    For this petition, state every ground on which you claim that you are being held in violation of the
        Constitution, laws, or treaties of the United States.  State the facts supporting each ground.

GROUND ONE:

        CALIFORNIA AUTHORITIES' REFUSAL TO RELEASE CARLIN ON
        PAROLE HAS DEPRIVED HIM OF DUE PROCESS OF LAW UNDER THE
        FEDERAL CONSTITUTION.

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.)

        A.    THE BOARD IS BIASED AGAINST GRANTING PAROLE TO LIFERS
                AND WAS IN CARLIN'S CASE; ITS PRACTICE OF RARELY GRANTING
                PAROLE DEPRIVED CARLIN OF THE PRESUMPTION OF PAROLE
                UNDER PENAL CODE SECTION 3041, WHICH REQUIRES THAT THE
                BOARD ESTABLISH A PAROLE DATE FOR A PRISONER AT HIS FIRST
                HEARING EXCEPT IN UNUSUAL CIRCUMSTANCES, THUS VIOLATING
                FEDERAL DUE PROCESS.

        Penal Code section 3041 establishes the legislative scheme for the parole of murderers

and other life-sentenced prisoners like Carlin.  Its subdivision (a) provides that "the Board ...

shall normally set a parole date" at a lifer's first parole consideration hearing.  It further provides

that "[t]he release date shall be set in a manner that will provide uniform terms for offenses of

similar gravity and magnitude in respect to their threat to the public, and that will comply with

the sentencing rules that the Judicial Council may issue and any sentencing information relevant

to the setting of parole release dates.  The Board shall establish criteria for the setting of parole

release dates ...."  Its subsection (b) provides that "the panel or board shall set a release date

unless it determines that the gravity of the current convicted offense or offenses, or the timing

and gravity of current or past convicted offense or offenses, is such that consideration of the

public safety requires a more lengthy period of incarceration for this individual, and that a parole

date, therefore, cannot be fixed at this meeting."  The Board's denial of parole to Carlin is part of

its practice of granting parole in the overwhelming number of cases that come before it, contrary

to the design of section 3041 for the regular parole of such lifers.  The Board failed to determine

Carlin's suitability for parole against the statute's base requirement that a parole date normally

be set for a murderer.

Before 1977, prisoners were sentenced to indeterminate terms for all types of felonies

under a scheme known as the Indeterminate Sentencing Law (hereafter ISL).  Under the ISL the

Board had almost unlimited discretion in determining suitability for parole and in fixing terms

within the statutory parameters, and there were no standards to guide the Board in doing so.  *See*

*In re Rodriguez*, 14 Cal.3d 639, 646 (1975); *In re Wingo*, 14 Cal.3d 169, 182 (1975); *In re*

*Monigold,* 139 Cal.App.3d 485, 590 (1983); *People v. Martin*, 42 Cal.3d 437, 442 (1986); *see*

*also In re Scott,* 119 Cal.App.4th 871 (2004).  The practices of the Board under the ISL were

subject to criticism and litigation because of the haphazardness and arbitrariness of the process.

*In re Dannenberg*, 34, Cal.4th 1061 (2005).  Consequently, in the wake of *Rodriguez* and other

dissatisfaction from the perceived arbitrariness of the disparate parole determinations and

resulting terms, the Board in 1976 established criteria and standards for parole determinations

and term guidelines to ensure that the Board's setting of prison "terms … are not

disproportionate to the culpability of the individual offender."  *In re Rodriguez*, 14 Cal.3d at p.

652; *see also In re Stanley*, 54 Cal.App.3d 1030, 1036-1042 (1976); *In re Stanworth*, 33 Cal.3d

176, 183-184 (1982); *In re Seabock*, 140 Cal.App.3d 29 (1983); *In re Duarte*, 143 Cal.App.3d

943, 947-948 (1983).  The Board also reformed its practice to better achieve uniform,

proportionate, and predictable terms by directing its panel members to make "every effort … to

establish parole dates the first time the inmate appear[ed] for regularly scheduled parole

consideration." *See In re Stanley*, 54 Cal.App.3d at p. 1034, quoting the Board's directive.

Under the ISL, the Board found 90% of first-degree murderers suitable for parole. *See Ewing v.

California*, 538 U.S. 11 (2003) [123 S.Ct. 1179, 155 L.Ed.2d 108, 123-138] (dis. opn. Breyer,

J.), citing "Historical Data for Time Served by Male Felons Paroled From Institutions 1945-

1981" dated October 5, 1982, and prepared by the Offender Information Services,

Administrative Services Division, Department of Corrections.

      Despite these reforms, a building momentum against the arbitrariness of the

indeterminate sentencing scheme resulted from the litigation and criticism of the Board and the

ISL, so that in 1976 the Legislature enacted the Determinate Sentencing Law (DSL) set forth in

section 1170, effective July 1, 1977.  In general, the change in the law from the ISL to the DSL

emphasized standard terms for punishment over individual assessments of rehabilitation and

public safety.  The result allowed most offenders (including second degree murderers) to parole

after they had served the requisite determinate term regardless of whether they were rehabilitated

or presented a threat to public safety upon their release, and assured that the terms served were

uniform and proportionate to the crime as determined by the range of punishment the Legislature

selected for each offense.  *See* Cal. Pen. Code, § 1170.  The Legislature determined that for the

some crimes such as first degree murder, kidnap for robbery or ransom, and a few others[1] (*see In*

---

[1]  By initiative effective November 8, 1978, the law was amended to provide for longer terms of
confinement for those convicted of first degree murder, with the establishment of a minimum
term of 25 years, that could be reduced with conduct credits to 16 2/3 years, as opposed to the 7
years a first degree murderer was required to serve before parole eligibility.  *See* § 190; *see also*
Cal. Code Regs., tit. 15, § 2400.  *Id.*  The initiative also changed the punishment for second
degree murder from a determinate term of five, six, or seven years to an indeterminate term of 15
years to life, with conduct credits that could reduce that minimum term to 10 years.  These
changes left intact the obligation of the Board to normally find prisoners suitable for parole at the

*re Monigold*, 139 Cal.App.3d at p. 490), it would retain a form of the ISL that balanced the
interests of uniformity and proportionality on the one hand, with individual assessments of public
safety on the other. *See* Pen. Code, §§ 1168, 1170, 3041; *see also In re Morrall*, 102
Cal.App.4th 280, 288-289 (2000). The Legislature retained life terms for such crimes, with
parole and term determinations still performed by the Board. *See, e.g.*, Pen. Code, §§ 1168 and
3041. It balanced uniformity of sentence with individual assessments of public safety by
providing in Penal Code section 3041 that parole normally be granted at a prisoner's first parole
hearing pursuant to regulations setting standards of punishment, and that the setting of a prison
term and parole date could be deferred only when exceptional considerations of public safety
(gravity, seriousness, timing of offense/offenses) counseled in the Board's judgment in that
individual case in favor of postponing the setting of a date. Thus, against a norm requiring the
Board to routinely set a prisoner's parole at his first consideration, the Legislature granted the
Board power in an individual case to deny parole when public safety demanded it. *See In re
Scott*, 119 Cal.App.4th at pp. 884-885, citing *In re Ramirez,* 94 Cal.App.4th at pp. 559-560 and
569-570. By so providing, the Legislature signaled its intent to provide generally for uniformity
of punishment, and to permit concerns for public safety to trump uniformity only in the
exceptional case where the individual circumstances of the prisoner showed that his parole
would unreasonably endanger public safety.

   After enactment of the DSL and pursuant to the directive in section 3041, subdivision (a),
the Board established criteria for granting parole dates and setting prison terms for lifers in title

first suitability determination as well as the criteria for making the suitability determination. *See*
Cal. Code Regs., tit. 15, § 2400; *compare, e.g.*, Cal. Code Regs., tit. 15, § 2281 with § 2402. The
change in law was designed simply to insure that such prisoners serve the longer sentences
required by the minimum terms.

15, division 2, chapter 3, article 11 of the California Code of Regulations.  *See generally In re
Rosenkrantz*, 29 Cal.4th 616, 653-654 (2002).  Following section 3041, which itself had
incorporated the reforms adopted by the Board discussed above just prior to enactment of the
DSL, the 1977 rules directed the Board to "normally" grant parole and reserve an "unsuitability"
deferral for exceptional cases.  In Register 77, Nos. 28 and 44, the Board adopted California
Code of Regulations, title 15, section 2280:  "A life prisoner shall be considered for parole for
the first time at the initial parole consideration  hearing.  At this hearing, a parole date shall
normally be set...."  The unsuitability exception was a limited one.  Former section 2280 quoted
the language of Penal Code section 3041, and made only a few, very narrow additions to it:

> Unsuitability.  In determining whether a prisoner is unsuitable for
> release, the hearing panel shall consider whether the public safety
> requires a more lengthy period of confinement because of the
> timing and gravity of the current offense or past offenses, if any, of
> which the prisoner was convicted....  Examples of factors
> indicating unsuitability include:
>      (a) A history of violent conduct resulting in serious bodily
> injury, great bodily injury, or death.
>      (b) A persistent pattern of serious criminal behavior and a
> failure to demonstrate evidence of a substantial change for the
> better.
>      (c) The presence of a mental or emotional disorder related
> to the prisoner's criminality which creates a high likelihood that
> new serious crimes will be committed if the prisoner is released.

In Register 78, No. 14, former section 2280 retained the requirement that "... a parole
date shall normally be set.  The parole date shall be set in a manner that provides uniform terms
for offenses of similar gravity and magnitude in respect to their threat to the public...."

In 1979, Register 79, No. 24, the Board inexplicably turned on its head the statutory
presumption in Penal Code section 3041 that parole is normally to be granted, leading to the
present California Code of Regulations, title 15, section 2281, which provides:

> Regardless of the length of time served, a life prisoner shall be
> found unsuitable for and denied parole if in the judgment of the
> panel the prisoner will pose an unreasonable risk of danger to
> society if released from prison.

*See also In re Scott*, 119 Cal.App.4[th] at p. 886. No statutory amendment authorized this reversal

of the presumption of parole suitability and establishment of a parole date at the initial parole

consideration hearing established in section 3041 or the insulation in a cocoon of individual

consideration of a practice that makes the denial of parole the norm rather than the exception.

The Board does not normally grant parole to murderers as the statute requires. Rather, as

of November 24, 2003, the BPT granted parole in only 370 cases in their last 13,000 parole

hearings for more than 6,000 lifers; only 294 of those parole grants were for murderers. The

Board over the years has become notorious for its denial of parole to the vast majority of eligible

murderers, granting parole dates to 1% or less of them. *See, e.g., In re Rosenkrantz*, 29 Cal.4th

at p. 685 (Board granted parole to murderers 1% of time in its last 4800 hearings).

Parole dates are almost never granted at the initial hearing, even where the prisoner has

demonstrated exceptional rehabilitation. When the Board finally does grant a prisoner a parole

date, he is usually long past his minimum parole eligibility, so that even these prisoners are

spending years more in prison than called for by the term eventually imposed. Consequently, the

Board has returned to its old, discredited, and prohibited ISL practice of randomly determining

the suitability of an individual prisoner for parole, resulting in disparate and unpredictable terms

that fail to provide for uniformity and proportionality of punishment.

The Board systematically fails to consider substantial evidence in individual cases that

shows the prisoner is suitable for release from prison. *See, e.g., In re Scott*, 119 Cal.App.4th at

pp. 897-898; *In re Ramirez*, 94 Cal.App.4[th] at p. 572.

Systematically the Board's implementation of Penal Code section 3041 is outside the authority and parameters of that section, is arbitrary, and violates federal due process.

The handful of grants of parole given by the Board has involved prisoners whose crimes were mitigated and/or who made far more than the ordinary or normal showing of suitability for parole than the statute contemplates entitles a murderer to a parole date; all of them involved a showing of suitability for parole that was extraordinary and compelling.

The Board Commissioners have substituted their personal and politically-inspired views that public safety requires the continued and permanent incarceration of almost all murderers, instead of carrying out their duty to balance uniformity and proportionality with public safety, and to apply the Legislature's view that public safety requires longer incapacitation only of the most grievous murderers with most murderers entitled to the setting of a parole date at their first parole hearing.

Implementation of the parole system in California has turned upside down the legislative contemplation that murderers normally be found suitable for parole and released at a time proportionate to the individual's culpability.  Instead of honoring the law's mandate to normally parole murderers, the parole system has arbitrarily established a policy of almost never permitting parole of them.  In sum, Carlin was not afforded federal and state constitutional due process guaranties in the determination of and rejection of his suitability for parole because the parole system arbitrarily violated the state's scheme for the parole of murderers, including Penal Code section 3041's requirement that parole be the norm.  *See Hicks v. Oklahoma*, 447 U.S. 343 (1980) (arbitrary deprivation of a state statute affecting life or liberty constitutes a violation of federal due process).  Finally, an executive practice of parole denial that imposes greater punishment on a prisoner ex post facto violates his right to due process of law.  *See, e.g., Young*

AO 241
(Rev. 12/04)
(Further Revised by Law Office of Michael Satris for Challenge to Parole Denial)                    Page# 12

v. *Weston*, 176 F.3d 1196 (9th Cir. 1999) (although law may not be ex post facto on its face, it

can be ex post facto as applied); *Rogers v. Tennessee*, 532 U.S. 451 [149 L.Ed.2d 697, 121 S.Ct.

1693 ] (2001) (retrospective change in law detrimental to criminal defendant effected by other

than legislative/regulatory means implicates due process).

> B.    THE EVIDENCE DOES NOT SUPPORT THE BOARD'S DENIAL OF
>        PAROLE, THE DECISION FAILED TO CONFORM TO THE
>        CONTROLLING STATUTE AND REGULATIONS; AND THE
>        DECISIONMAKERS WERE BIASED.

The facts of the commitment offense before the Board at Carlin's hearing in 2003 are as

follows:

> On 6-10-80, Carlin confronted several acquaintances about a 9-mm
> handgun stolen from his room at the Golden Eagle Hotel.  He
> suspected one of three person to have stolen it and he confronted
> the first suspect, Travis in his room at the Golden Eagle Hotel.
> Travis denied stealing the gun and stated he thought Robert Evans
> had taken the gun.  Travis and Carlin then armed themselves with
> handguns and went to the Marconi Hotel to confront Evans over
> the stolen gun.  Evans denied stealing the gun and he implicated
> Curtis Jackson, who resides at the Golden Eagle Hotel, in the
> stealing of the gun.  Carlin, along with Evans, Travis and a
> Bernard Verrett, went back to the Golden Eagle Hotel to speak
> with Jackson.  Evans knocked on Jackson's door, and when the
> door opened a few inches, Carlin fired on shot from his gun
> striking Jackson in the chest.  Jackson died almost instantaneously
> of the gunshot wound.  Carlin was arrested later in the day.

> Carlin has explained that he met Curtis Jackson and Robert Evans
> for the first time on the same day of the shooting.  Carlin agreed to
> buy the two men a bottle of Vodka and the three met and returned
> to Carlin's room at the Golden Eagle Hotel.  Jackson and Evans
> began playing with Carlin's attaché case, which contained a
> handgun.  In order to get the men out of his room Carlin agreed to
> go out and get them some heroin.  Carlin left the hotel and went
> out for a couple of hours.  When he returned he saw the lock on his
> door had been broken and his attaché case was missing.  Calrin
> notified the police of the missing gun and of his suspicions that
> Jackson had stolen the gun but he could offer not proof.  Carlin had
> learned that both Evans and Jackson were considered dangerous so

he armed himself and went to confront Evans over the theft of the
gun  Evans indicated that Jackson had stolen the gun.  They
returned to the Golden Eagle Hotel where Evans knocked on
Jackson's door.  Carlin started to enter Jackson's room after
Jackson opened the door and thought there was a gun in Jackson's
hand.  Carlin raised his own gun and it accidentally discharged.
Carlin states he never pulled the trigger and he was acting in self-
defense.  He states that he is a non-violent person and was in the
wrong place at the wrong time.  He states he never meant to hurt
anyone.

For over fifteen years, forensic examiners who have evaluated Carlin for release

consistently have found that his release on parole would pose little or no risk to the public and

that his prognosis for successful parole was good.  The following is a representative sample of

these professional reports to the Board:

- 2003 Evaluation by San Quentin Staff Psychologist Carol W. Fetterman, Ph.D.:

  Considering all the[] factors, his risk for future violence is very low.

  Mr. Carlin's record in prison demonstrates that his values, attitudes and
  identifications have changed since he was a young man.  It is unlikely that he
  would engage in criminal activity again.

- 2000 Evaluation by San Quentin Staff Psychiatrist William Deignan, M.D.:

  After 20 years of incarceration he seems to be as much rehabilitated as he is going
  to be.  His former lifestyle appeared to be one of a younger man and he now has
  different interest[s] and it is not likely that he would engage in criminal action
  again. …[U]nder parole conditions I believe that he will respond very well and he
  could become a self supportive member of society.

- 1998 Evaluation by San Quentin Staff Psychologist Robert Flax, Ph.D.:

  Mr. Carlin has made positive use of his time in prison, including programs,
  schooling, and work.  These gains should maintain themselves in a less controlled
  environment, such as in the community.

  There is no psychiatric reason why Mr. Carlin should be denied parole.

AO 241
(Rev. 12/04)
(Further Revised by Law Office of Michael Satris for Challenge to Parole Denial)                    Page# 14

- **1996 Evaluation by San Quentin Staff Psychiatrist Raymond P. Moczulski, M.D.:**

His violence potential … is judged to be below average for this population … based on the following observations:

1) With the exception of the commitment offense, the inmate does not have a past history of significant violent criminal offense.…

2) The situational nature of the crime;

3) Although it appears that the inmate had been on a prescribed narcotic pain-killer as well as a small amount of alcohol at the time of the offense, … the inmate had been essentially free of alcohol and marijuana use for the past 16 years prior to the instant offense;

4) The inmate has remained free of any violent activity while in the prison system for the past 16 years.

- **1995 Cat "X" Evaluation by San Quentin Staff Psychologist Les Carr, Ph.D.:**

There is no evidence to indicate an antisocial personality disorder of a criminal type. Mr. Carlin's psychological test results suggested that his prior violent crime was directly related to his drug/alcohol involvement at that time, as well as his prior identification with the counter-culture of the 1960's. Today, Mr. Carlin has no connection to or identification with his former lifestyle. Mr. Carlin is functioning on a superior level of intelligence. There was no evidence of any continuing dependency on alcohol/drugs.

Mr. Carlin's psychological examination results revealed no potential for violence. His violence potential outside a prison setting should be viewed as "below average."

Mr. Carlin is a skilled union carpenter whose skills would be very much in demand in the workplace. Also, as a result of his incarceration, he has enhanced his computer-related skills. Mr. Carlin has the necessary vocational skills to maximize his potential to make a satisfactory adjustment in the external community.

- **1994 Evaluation by San Quentin Staff Psychologist Les Carr, Ph.D.:**

One might characterize Mr. Carlin's behavior as reflecting a renaissance type individual who [is] fascinated by and interested in a broad range of ideas and subjects.

Mr. Carlin[] … [is] an individual … who is in the process of evolving in terms of positive personal and emotional growth and coming to terms with his criminal

acts and drug/alcohol abuse, which feels very much to him as having been committed well into the past — "another life." Rather than engaging in denial, Mr. Carlin admits his wrongs committed and has sincere feelings of remorse and regret. He views himself as having aged and considerably wiser as a result of his reflections, prison experiences, and having further educated himself. He is quite philosophical regarding his prison incarceration. His position is that he deserved such a period of imprisonment for his crime, and at the same time, he views prison as an opportunity to have the time to read, study, and grow intellectually. … He takes pleasure (and it is a source of great emotional support) in his having a long-term close relationship with his wife and daughter ….

[T]here was no evidence of a long-term pattern of an antisocial criminal type personality structure…. His psychological examination revealed no potential for violence and he has the capacity to make a significant contribution as a citizen to the external community. Therefore, his potential for violence in the community is average to below-average.

- 1992 Evaluation by Richard J. Obrochta, Ph.D.:

The subject is an unusually intelligent and educated inmate whose initial anti-establishment values/activities escalated into more serious offenses: culminating in the instant offense. The subject got into serious problems by seemingly wanting to leave the middle class culture in favor of what was once termed the Bohemian or Flower Children movement. Now he owns up to his responsibility for the instant offense and is reconciled to the fact he must serve his sentence in prison.

As far as violence potential in the community is concerned, the subject is evaluated as average for the population and decreasing in this potential.

- 1989 Evaluation by D.V.I. Senior Psychiatrist, George Maloof:

He considers murder as the worse form of violence and deemed his killing the victim barbarous. He claimed to feel remorse for the act, and has been tormented as he tries to find a way to pay for the crime.

In a less controlled setting such as return to the community, this inmate is considered likely to hold present gains.

Violence potential outside a controlled setting in the past is considered to have been average and at present is estimated to be decreased.

AO 241
(Rev. 12/04)
(Further Revised by Law Office of Michael Satris for Challenge to Parole Denial)                    Page# 16

For nearly as long, correctional counselors responsible for the supervision of Carlin have reported to the Board their findings that his release on parole would pose little risk to the public. The following is a representative sample of the correctional advice to the Board:

- 2003 Evaluation Report by Correctional Counselor L. Shaw:

  Considering his commitment offense, prior criminal history, adjustment to prison, family support, offers of employment and psychiatric reports, I continue to believe that Carlin would pose a low degree of threat to the community if he were to be released.

- 2002 Evaluation Report by Correctional Counselor Shaw:

  I believe that Carlin would pose a low degree of threat to the community if he were to be released.

- 2001 Evaluation Report by Correctional Counselor Francis:

  Considering the commitment offense, prior criminal history, adjustment to prison, family support, offers of employment and psychiatric reports, I continue to believe that Carlin would pose a low degree of threat to the community if paroled from prison.

- 2000 Evaluation Report by Correctional Counselor Francis:

  I continue to believe that Carlin would pose a low degree of threat to the community if paroled from prison.

- 1998 Evaluation Report by Correctional Counselor Francis:

  [T]his writer believes that Carlin would pose a low degree of threat to the public's safety if released on parole at this time.

- 1997 Evaluation Report by Correctional Counselor Francis:

  [T]his writer believes the prisoner would pose a moderately low degree of threat to the public's safety if released on parole at this time.

- 1996 Evaluation Report by Correctional Counselor Edwards:

  [T]his writer believes this inmate would pose a low degree of threat to the public at this time.

- <u>1995 Evaluation Report by Correctional Counselor Wilson</u>:

  [T]his writer believes the inmate would probably pose a low degree of threat to the public if released from prison at this time.

- <u>1994 Evaluation Report by Correctional Counselor Johnston</u>:

  [T]his writer believes the inmate would probably pose a low degree of threat to the public if released from prison at this time.

One of the two members of the Board panel that most recently considered Carlin for parole, a deputy commissioner, citing what the panel member found to be "a little bit of doublespeak in the psych report," advised Carlin that he was otherwise suitable for parole, explaining to him:  [I]t's useless to set someone for ... parole if all the ducks are not in a row. And we think that they're very, very close, but not quite."

The district attorney, who was satisfied with a pre-trial disposition of manslaughter (which Carlin refused), supports Carlin's release.  He advised the Board at Carlin's parole hearing in December 2003:  "There's only one other inmate that I can recall that has programmed as well as this gentleman.  Based on the totality of the circumstances, I think you should give him a date."

The Board's conclusion at that hearing that Carlin presently "poses an unreasonable risk of danger to others" if released from prison on parole illustrates its arbitrary and capricious practice.  That conclusion was based on findings that are unsupported by the evidence and in fact conflict with it.  The Board characterized as its "primary and paramount reason" for denying parole "the timing and gravity of the committing offense," "the murder of Curtis Jackson," which the Board found "was carried out in a vicious and brutal manner ...." As the Board explained, the homicide arose after Jackson stole property, including a handgun, out of Carlin's hotel room. According to the Board:

AO 241
(Rev. 12/04)
(Further Revised by Law Office of Michael Satris for Challenge to Parole Denial)

> Once the prisoner identified that the victim was the culprit, the offense was carried out in a dispassionate and calculated manner ... which demonstrates an exceptionally insensitive disregard for human suffering. The prisoner and several others who were there at the hotel went to the victim's room, knocked on the room door, and then ... [Carlin] fired the shot shooting the victim in the chest causing the victim's demise. There was no real reasoning to do or to shoot this victim. The motive of the crime was inexplicable and very trivial in relationship to the offense. The prisoner had already contacted the police about missing items. The prisoner decided to take into his own hands the law.

The Board's finding that this murder was exceptionally grave so that it could reasonably invoke the exception to the law's mandate that requires it to set a parole date for the usual murder was irresponsible hyperbole untethered to the facts of the case. Carlin knew Jackson to be armed and dangerous, having been released from San Quentin only weeks earlier and having just stolen a gun. Carlin raised his weapon at Jackson only after he thought that Jackson went for his firearm, and in the panic of that moment the gun fired with Carlin's instinctive movements. That was the single shot fired, and Carlin immediately yelled for someone to call an ambulance. Jackson died instantly. Far from inexplicable, Carlin confronted Jackson to retrieve property that he believed Jackson took from his room. Far from trivial, Carlin acted out of the basic instinct of self-defense when he apprehended — mistakenly — immediate peril to his own life. The second degree murder conviction apparently was based on the theory of implied malice offered to the jury, for Carlin with conscious disregard of the danger to life confronted Jackson as he did, leading to Jackson's death. As murders go, there was nothing especially brutal or insensitive to suffering about it. Rather, it was on the lower end of the spectrum of gravity for murder, with elements of manslaughter to it as reflected by the prosecutor's pretrial plea offer.

A murder offense can provide a basis for finding a prisoner would present an unreasonable risk to the public if released only if it is a particularly egregious and grave one.

The Board's rules recognize certain types of aggravated conduct in a murder that tend to support a finding of parole, i.e., sexual mutilation occurred, multiple victims were killed, the victim was tortured, or the murder was particularly heinous, atrocious and cruel. Cal. Code Regs., tit. 15, § 2402. None of those circumstances applies here. In sum, the Board's attempt to aggravate the murder in this case by describing it with adjectives such as "brutal" and "vicious" and "dispassionate" and "calculated" and as demonstrating an "exceptionally insensitive disregard for human suffering" is belied by the facts. As in *In re Scott*, 119 Cal.App.4th 871, 892: "Because the relevant evidence shows no more callous disregard for human suffering than is shown by most second degree murder offenses, the Board's use of this factor to conclude that [the prisoner] committed his offense 'in an especially cruel and callous manner' was arbitrary and capricious."

Secondly, the Board found that Carlin's "prior history of criminality and misconduct" was a circumstance showing that he presently posed an unreasonable risk if released. As the Board described that history:

> He ... had a prior prison term ... for selling narcotics to an undercover FBI agent. The prisoner failed previous grants of parole and cannot be counted upon to avoid such criminality. He failed to profit from society's previous attempts to correct his criminality [which ] included ... the prior ... prison term as well as probation.

The parole board rules do not authorize a finding of unsuitability to be based on prior criminal nonviolence. California Code of Regulations, Title 15, section 2402, subdivision (c), rather, lists "Previous Record of Violence" as a factor of unsuitability. As it further elaborates on that criterium:

> The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

The Board never even purported to establish that factor in its finding on Carlin's criminal history

here.  Indeed, for the eight years preceding the murder, Carlin had no criminal convictions.

Carlin did serve a 13-month prison sentence in 1966 (when he was 19 years old) in New Jersey

for sale of marijuana.  After <u>successful</u> completion of parole,[2] he was again arrested in 1968 for

possession of one-tenth of a gram of hashish and in 1972 was arrested for possession of

marijuana and assault with a dangerous weapon.  Both the 1968 and 1972 incidents were

disposed of in 1972 with the imposition of a three-month suspended sentence.  The suspended

sentence disposition refutes a characterization that "serious injury" — as contemplated by the

parole guidelines — was involved, nor did the Board purport to find such or point to any

underlying facts which could support such a conclusion.

      The Board next found in support of its parole unsuitability finding that Carlin "has ... not

participated in beneficial self-help programming at this time."  Not only did the Board fail to

point to anything in the record that supported this finding, it demonstrated the arbitrariness of

that finding with the following findings sandwiched around that one:

> Institutional[ly], ... the prisoner has been performing admirably.
> He only has one 115 [rules violation report], and that was in 1986.
> ...  He has participated in ... multiple self-help groups over the
> course of time.
> ...................................................................
> [T]he prisoner should be commended for making multiple
> headway....  [I]n terms of disciplinaries, none since 1986 and only
> having one.  He is working self-help groups, Cartagio [sic:
> Katargeo], AA, NA in the past, Making it Work, Importance of
> Self-Responsibility, Self-Esteem, Moral and Social Accountability,
> Arts and Corrections, positive reports as a library clerk, clerk in
> PIA.  He has educated himself.  He has ... accomplished an AA
> since being incarcerated as well as a BA prior in 1971.  He has

---

[2]  The Board's finding that "the prisoner failed previous grants of parole" is clearly erroneous, for
this is the only time that Carlin was on parole.

<div style="margin-left: 2em;">participated in Toastmasters as well as tutor with the Laubach
tutoring program.</div>

The Presiding Commissioner also found: "You're doing the right kinds of things, Mr. Carlin.

You're a positive inmate.  You have positive programming."

    Lastly, the Board denied Carlin parole because it found that the 2003 psychological

evaluation prepared for it "is not totally supportive of release" "in that under ... the inmate's

level of insight and remorse, the doctor writes that the prisoner felt attracted to the character of a

gangster ... [and though] he realizes that it was a bad choice of identification, [he] still does not

have any insight as to why it was compelling to him.  He doesn't appear to have explored what in

his history of character caused him to be drawn to the criminal world."  This, again, was an

arbitrary finding, for the 2003 report *was* "totally supportive of" parole.  Under the section

"Significant Risk Factors/Precursors to Violence," the doctor found that "[c]onsidering all these

factors — including that Carlin's "lack of insight is only partial" —, "his risk for future violence

is very low."  The clinician concluded:

<div style="margin-left: 3em;">Mr. Carlin's record demonstrates that his values, attitudes and
identifications have changed since he was a young man.  It is
unlikely that he would engage in criminal activity again.  He has
not had any problems since 1986 in his work, or relationships with
staff and other inmates.  He has had laudatory chronos in assisting
staff with computer problems and above average work reports.  He
has educated himself, prepared himself for a second career in case
he needs it, and has support systems both in New Jersey and in
California. ...  There are no psychiatric reasons for Mr. Carlin not
to be paroled.</div>

    The fact that an evaluation is not entirely uncritical of a subject provides no basis to find

the subject an unreasonable risk on parole.  Few are perfect.  Under the Board's rules,

"Psychological Factors" are a circumstance of unsuitability only if "[t]he prisoner has a lengthy

history of severe mental problems related to the offense."  Cal. Code Regs., tit. 15, § 2402, subd.

AO 241
(Rev. 12/04)
(Further Revised by Law Office of Michael Satris for Challenge to Parole Denial)                                    Page# 22

(c)(5).  The most recent psychological evaluation — consistent with all the prior ones of Carlin — cannot reasonably be deemed other than favorable to parole.

The evidence showed that Carlin satisfies all the circumstances in support of a finding of his suitability for parole, and that none of the unsuitability factors applies to him.  Indeed, Carlin is the epitome of an inmate who has paid his debt to society and is suitable for parole.  The suitability criteria set forth in the controlling regulations (Cal. Code Regs., tit. 15, § 2402, subd. (d)) are the following:

> (1)  No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm" to victims.

The Evidence:  Carlin does not have a juvenile record of assaulting others as a juvenile or committing crimes likely to cause personal harm to the victims.

> (2)  Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

The Evidence:  Carlin came from an unusually stable, pro-social middle-class family with strong religious principles, with whom he remains to this day very close.  There is no mental illness, criminality, drug abuse, or other dysfunction in his family background.  He attended strict Catholic schools through high school, where he did well in sports and academics, and proceeded to Rutgers University.  He worked for a number of years thereafter as a carpenter prior to his offense.  He has been in a loving marriage that has lasted more than twenty years and produced a child with whom he is very close.

> (3)  Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

The Evidence:  Carlin immediately called out for someone to call an ambulance after he

Case 3:06-cv-04145-SI   Document 1   Filed 07/03/06   Page 23 of 43

realized he had shot the victim. Moreover, prison staff for at least a decade have noted Carlin's

remorse, ranging from Dr. Carr's observation in 1994 that "[r]ather than engaging in denial, Mr.

Carlin admits his wrongs committed and has sincere feelings of remorse and regret," to

Counselor Shaw's report in December 2003 that "Carlin continues to express remorse for his

crime and he accepts full responsibility for his actions." Indeed, the Board explicitly found such

at Carlin's last hearing, observing to him that "[y]ou have remorse for the committing offense."

> (4) Motivation for Crime. The prisoner committed his crime as the result
> of significant stress ...

The Evidence: The crime occurred after Carlin came to California during an economic

downturn where his difficulty in finding work was compounded by a car accident that disabled

him from working. That stress was compounded by stress in his home life, which caused him to

take up temporary residence in a shabby residential hotel without the stabilizing influence of his

family. Objects, including a gun that he was storing for a friend, were then stolen from his room

by Jackson, a recently paroled felon whom Carlin had been told was dangerous. When Carlin

confronted Jackson, Jackson made a motion that Carlin took to be one going for a gun. Carlin

raised his own firearm in self-defense and in the panic of that moment pulled the trigger before

he knew it. Carlin immediately called for an ambulance. The factors of this situational offense

are extremely unlikely to again coalesce.

> (5) Lack of Criminal History. The prisoner lacks any significant history
> of violent crime.

As discussed in connection with the arbitrariness of the Board's finding that Carlin's

criminal history weighs in favor of a finding of unsuitability, his single prior criminal conviction

of a violent nature years earlier and resolved with a three-month suspended sentence shows that

he lacked a significant history of violent crime.

(6)  Age.  The prisoner's present age reduces the probability of recidivism.

The Evidence:  Carlin is now 59 years old.  Californians that age rarely commit an

offense warranting imprisonment.  It is even rarer for a person that age to commit another crime

after service of a long term in prison.  As for Carlin in particular, it most recently was reported

that Carlin's "values, attitudes and identifications have changed since he was a young man [such

that] [i]t is unlikely he would engage in criminal activity again."  This confirms earlier reports

that Carlin's "former lifestyle appeared to be one of a younger man and he now has different

interest[s] and it is not likely that he would engage in criminal action again."  Even earlier, it was

noted that Carlin "continues to demonstrate growth, maturity and ability to learn from past

experience ...."  Over a decade ago it was noted that "Today, Mr. Carlin has no connection to or

identification with his former lifestyle."

(7)  Understanding and Plans for Future.  The prisoner has made realistic
plans for release or has developed marketable skills that can be put to
use upon release

The Evidence:

[Carlin's] plans for work and reuniting with his family have a
high degree of succeeding ....

He has educated himself, prepared himself for a second career
in case he needs it, and has support systems both in New
Jersey and in California.

Future parole plans as detailed at the last hearing were both realistic and documented.  The

Board implicitly endorsed them, noting to Carlin that "[y]ou've got strong family support, all of

the things are falling into place for you."

(8)  Institutional Behavior.  Institutional activities indicate an enhanced
ability to function within the law upon release.

The Evidence:  That Carlin's institutional behavior indicates an enhanced ability to

function within the law upon release vastly understates his case.  His post-conviction

rehabilitation is stamped upon virtually every page of the record and makes a compelling

showing that he would pose no unreasonable risk upon his release.  Indeed, everyone — except

the Board — has so found, so that the point need not be belabored here.

In sum, as in *In re Scott*, 119 Cal.App.4th at p. 898, "Undisputed evidence demonstrates

the existence in this case of all of the foregoing circumstances .... The Board referred to some of

them ... but failed to take into account [most of them].  ...  The Board's failure to undertake the

"individualized consideration of all relevant factors" required by *Rosenkrantz*, 29 Cal.4th at page

655, 128 Cal.Rptr.2d 104, 59 P.3d 174, also offends the Board's own regulations, which require

that "*[a]ll* relevant, reliable information available to the panel *shall be considered* in determining

suitability for parole."  § 2402, subd. (b), italics added."

> D.   THE BOARD'S REPEATED DENIAL OF PAROLE BASED ON THE
> UNCHANGING CIRCUMSTANCES OF THE COMMITMENT OFFENSE
> AND OTHER PRE-OFFENSE FACTS IN THE FACE OF CARLIN'S LENGTHY
> REHABILITATION IS INIMICAL TO THE PURPOSE OF THE
> INDETERMINATE SENTENCING LAW AND VIOLATES DUE PROCESS
> OF LAW.

For the last 90 years, the law in California has required the parole board to undertake an

individualized inquiry into the suitability of each prisoner for parole.  Thus, the purpose of

Indeterminate Sentencing Law is to evaluate the individual's personal culpability in light of the

individual's reformation.

As previously discussed, section 3041 requires that at a parole consideration hearing the

panel shall "normally set a parole release date ... unless [the parole board] determines that the

gravity of the current convicted offense or offenses, or the timing and gravity of current or past

AO 241
(Rev. 12/04)
(Further Revised by Law Office of Michael Satris for Challenge to Parole Denial)

convicted offense or offenses, is such that consideration of the public safety requires a more

lengthy period of incarceration for this individual ....."

In addition, the unchanging commitment offense and other pre-offense facts regarding

Carlin may not forever be relied upon by the Board because of Carlin's longstanding showing of

rehabilitation.  The parole board regulations set forth specific criteria to determine whether a

prisoner is suitable for parole.  The commitment offense does not support the Board's decision to

deny parole because it is only a factor indicating a prisoner is not suitable for parole.

The Board found that Carlin's offense was exceptionally callous or brutal, with a trivial

motive.  However, by definition, in all second degree murders, the defendant acted with malice,

which is defined as the extreme indifference to the value of human life.  CALJIC No. 8.31 and

commentary thereto.  Despite this fact, the Legislature has provided that parole "shall normally"

be granted after 15 years.  § 190.

The Board has history of denying parole to Carlin based primarily upon the

circumstances of the commitment offense.  As of today, the Board has denied Carlin parole

numerous times based primarily upon the circumstances of the commitment offense.  His

minimum eligible parole date was in 1990, and the proportionate term/release date was 13 years

ago.  As noted above, the Board relied upon the commitment offense in denying parole by

concluding that the offense was carried out in an especially heinous, atrocious, and callous

manner, the motive was undetermined (but, according to the Board must have been inexplicable),

and the victim was defiled or abused.  Here, the Board's sentiment merely reiterates the Board's

decision at the 2002 hearing.

The Board in fact has cited the circumstances of the commitment offense as its main

reason for several years.  The stalemate of the aforementioned situation is aptly represented by

the Board's recommendations, which have basically stated that Carlin should continue his current course of conduct.  For several years the Board has provided the same essential recommendation.  The Board's redundant recommendations accentuate his exceptional programming and underscore the overwhelming weight that the Board has placed upon Carlin's commitment offense.

The Board's repeated reliance upon the circumstances of Carlin's commitment offense has served to eclipse all other factors of his suitability, making the situation a stalemate one of constitutional proportions.  The Board's repeated refusal to grant Carlin parole based upon the unchanging facts of the commitment offense and prior history, particularly in light of the showing of rehabilitation that Carlin has made meanwhile, violates his right to due process.  See *Biggs v. Terhune*, 334 F.3d 910, 916-917 (9th Cir. 2003).

(b) If you did not exhaust your state remedies on Ground One, explain why:          N/A

**GROUND TWO:**

> THE BOARD IN DENYING PAROLE TO CARLIN HAS VIOLATED HIS
> RIGHT TO BE FREE OF CRUEL AND UNUSUAL PUNISHMENT.

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.)

Same facts as set forth in Ground One.

(b) If you did not exhaust your state remedies on Ground One, explain why:          N/A

14.    Please answer these additional questions about the petition you are filing:

     (a)    Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?        ☑ Yes        ☐ No

     (b)    If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them:

15.    Have you previously filed any type of petition, application, or motion in a federal court regarding the State's refusal to parole you?        ☐ Yes        ☑ No

AO 241
(Rev. 12/04)
(Further Revised by Law Office of Michael Satris for Challenge to Parole Denial)                    Page# 28

16.    Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or

federal, concerning the refusal of the State to parole you or the underlying judgment of conviction?

☐ Yes        ☑ No

17.    Did any attorney represent you in any post-conviction proceeding in any court challenging the State's

refusal to parole you?   For each such attorney state, if you know, the:

(a)  Name of Attorney:                          Michael Satris/Margaret Littlefield

(b) Address and Phone Number of Attorney:       Law Offices of Michael Satris
                                                P. O. Box 337
                                                Bolinas, CA  94924
                                                (415) 868-9209

(c) Name of the court and proceeding in which the attorney represented you.

San Francisco Co. Superior Court
Case Nos. 4917 and 5028

Court of Appeal
First Appellate District, Division One
Case No. A111328

California Supreme Court
Case No. S137548

They have also assisted in the preparation of this petition.

18.    Do you have any future sentence to serve after you complete service of the life term from which you seek

parole?                          ☐ Yes        ☑ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future: N/A

(b) Give the date the other sentence was imposed:       N/A

(c) Give the length of the other sentence:              N/A

(d) Have you filed, or do you plan to file, any petition that challenges the execution of sentence to be

served in the future?                                  N/A

AO 241
(Rev. 12/04)
(Further Revised by Law Office of Michael Satris for Challenge to Parole Denial)

19.     TIMELINESS OF PETITION:  To meet the one-year statute of limitations as contained in 28 U.S.C.

§ 2244 (d) and explain why it does not bar your petition, set forth for each denial of parole challenged in

this proceeding:

(a) The date the State parole authority's denial of parole became final:

It never became final – Carlin's timely administrative appeal of the parole denial
was never answered by the Board.

(b) The date you first filed a petition in State court challenging that denial:

August 26, 2004

(c) The date the State Supreme Court finally denied that challenge:

December 14, 2005

Therefore, petitioner asks that the Court grant the following relief:

1.      Appoint counsel for Carlin.  Although he is currently represented by the

Law Offices of Michael Satris, and has been for over two years, this

representation has been without fee.  Carlin is indigent and unable to

afford counsel.  An in forma pauperis form, completed by the institution,

will be forthcoming.  In the meantime, counsel will pay the $5.00 filing

fee.

2.      Order the State to discharge him from custody.

3.      Alternatively, order the State to immediately parole him from prison.

4.      Alternatively, order the State to set a prison term for him and parole him

from prison pursuant to that term.

Or grant petitioner any other relief to which he may be entitled.

Petitioner further requests that the Court require the State to file an answer to his petition

and to file with that answer the administrative record reviewed by the parole authorities when

they denied him parole and the documents filed in the state court proceedings identified above in which Carlin challenged the State's refusal to parole him.

_____
Signature of Attorney (if any)

## NEXT FRIEND VERIFICATION

I, MARGARET LITTLEFIELD, declare under penalty of perjury under the laws of the United States:

I am an attorney admitted to practice before the courts of the State of California and this Court. My office address is: Law Offices of Michael Satris, P. O. Box 337, Bolinas, Marin County, California 94924. I am one of the attorneys representing Petitioner in this proceeding. I am authorized by Petitioner to file this petition for writ of habeas corpus on his behalf. Petitioner is imprisoned in San Quentin as set forth in the petition. I make this verification on Petitioner's behalf because obtaining his verification would only needlessly delay consideration of his petition, and the matters alleged in the petition are taken from the administrative record of his parole denials and other documents, which are as much in my knowledge as his knowledge.

I declare that the contents of this petition are true and correct.

Executed on June 29, 2006, at Bolinas, California.

_____
Signature of Next Friend

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.



FILED
San Francisco County Superior Court

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**FOR THE CITY AND COUNTY OF SAN FRANCISCO**

DEC 14 2004

GORDON PARK-LI, Clerk
BY: _____
Deputy Clerk

Department No. 22

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION OF | ) | WRIT NO. 4917 |
| | ) | |
| JAMES CARLIN | ) | |
| | ) | ORDER DENYING |
| Petitioner, | ) | PETITION |
| | ) | |
| FOR A WRIT OF HABEAS CORPUS | ) | |

A petition for a writ of habeas corpus has been received.

Petitioner, since 1980, has been serving a sentence of 15 years to life plus two years for second-degree murder with the use of a firearm.  The Board of Prison Terms ("Board") has considered eleven times whether to grant Petitioner parole.  The Board has denied the grant each time, most recently in December 2003. Petitioner has a filed an administrative appeal with the Board, an appeal that is pending.  Petitioner now appeals the Board's December 2003 decision to this court.

Petitioner, who is represented by counsel, puts forth three contentions in his writ.  First, Petitioner contends that the Board's practice of rarely granting murderers parole violates his right to due process and his right to be free from cruel and unusual punishment under the California and United States Constitutions.

Second, Petitioner contends that the Board's decision was arbitrary, capricious, and unreasonable in violation of § 3041 and violated his rights to due process and to be free from cruel and unusual

1

punishments under the California and United States Constitutions.

Third, Petitioner contends that the Board has acted outside of the authority granted to it by the Legislature. Petitioner further contends that the Board's practice of regularly denying parole violates the separation of powers doctrine under the California State Constitution.

I.        PETITIONER'S DUE PROCESS CONTENTIONS

The Board of Prison Terms has broad discretion in parole matters. In re Powell (1988) 45 Cal.3d 894, 902. Its decision will not be disturbed unless it has acted arbitrarily or capriciously. In re Ramirez (2001) 94 Cal.App.4th 549, 564. Under state law, due process only requires that there be "some evidence" to support the Board's findings. In re Rosenkrantz (2002) 29 Cal.4th 616, 652; Powell, supra, 45 Cal.3d at 904; Ramirez, supra, 94 Cal.App.4th at 562-64.

According to the relevant regulations, circumstances tending to establish unsuitability for parole include (1) whether the prisoner committed the offense in an especially heinous, atrocious or cruel manner (the factors under this include, but are not limited to, whether the motive for the crime is inexplicable or very trivial in relation to the offense); (2) possesses a previous record of violence; (3) has an unstable social history; (4) previously sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental health problems related to the offense; and (6) has engaged in serious misconduct while in prison. Cal. Code of Regulations, Title 15, § 2402(c).

The Board considered several of the above factors in making its decision. Among others, the Board concluded that the motive for the crime was "inexplicable and trivial."

Some evidence exists to support the Board's contention that the motive for the crime was inexplicable and trivial.  According to the facts presented at the 2003 parole hearing and in Petitioner's exhibits, Petitioner murdered Curtis Jackson in June 1980.  Believing that Jackson had stolen Petitioner's gun, Petitioner, with other persons, went to Jackson's room with the intention of retrieving his gun, knocked on the door and fired a single shot, which struck Jackson in the chest, causing his death.

On this point, the Board's determination was a reasonable exercise of discretion supported by some evidence.

The Board also considered Petitioner's prior criminal history.  Petitioner's brief to the Board states that before his current imprisonment he had been arrested in 1966 for selling marijuana (the charge of aiming a gun at an undercover officer during this incident was dropped), an offense for which Petitioner served thirteen months, in 1968 for the possession of hashish, another time for petty theft, for which Petitioner served thirty days and paid a fine, and in 1972, for the possession of marijuana and assault with a deadly weapon.  The 1968 and 1972 charges were disposed of by the imposition of a three-month suspended sentence.

To the Board, such a history indicates that the Petitioner "cannot be counted upon to avoid such criminality."  The Board noted that the "prisoner failed previous grants of parole and cannot be counted on to avoid such criminality."  On this point, the Board's determination was a reasonable exercise of discretion supported by some evidence.

The Board also stated that the prisoner would pose an unreasonable risk of danger to society or a threat to public safety, basing such a belief on the timing and gravity of the committing offense.  The Board, under Penal Code § 3041, can rely on the timing and gravity factor and find that that the murder came after "an escalating pattern of criminal conduct," indicating a risk to society if released.  On this point, the Board's determination was a reasonable exercise of discretion supported by some evidence.

Petitioner also contends that the Board's continued reliance on the commitment offense constitutes a due process violation under Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003).  In Biggs, the Ninth Circuit stated that the parole board's denial of parole based on the gravity of the offense and on prior conduct could, over time, create due process concerns.  Id. at 916.  Nonetheless, the appellate court affirmed the Board's decision to deny parole in that case based on these unchanging factors.  Id. at 916-17.

Petitioner's due process claim under Biggs fails.  First, the California Court of Appeal stated that it took the Biggs admonition in the context of that case.  In re Van Houten (2004) 116 Cal.App.4th 339, 363.  Biggs was a co-conspirator, who did not perform the murders himself.  Id.  In Van Houten, the petitioner, like Carlin, was a "hands-on" participant:  "Although the dictum [in Biggs] makes sense in the context of the case in which it was uttered, the dictum's force is diminished in this case because of the more hideous nature of the crime."  Id.  Second, under state law, due process only requires that there be "some evidence" to support the Board's decision.  In re Rosenkrantz (2002) 29 Cal.4th 616, 652.  As stated above, some evidence does exist to support the Board's decision. Third, this court is not bound by decisions of the Ninth Circuit.  People v. Avena (1996) 13 Cal.4th 394, 431.

4

II.      WHETHER THE BOARD'S DECISION VIOLATED
         PETITIONER'S RIGHT TO BE FREE FROM CRUEL AND
         UNUSUAL PUNISHMENT

     Petitioner bases his contention on the offered fact
that the Board rarely grants murderers parole and that
the continued incarceration of Petitioner has caused
great distress to his family.

     Courts have sought "to emphasize the considerable
burden a defendant must overcome in challenging a
penalty as cruel or unusual.  The doctrine of
separation of powers is firmly entrenched in the law of
California, and a court should not lightly encroach on
matters which are uniquely in the domain of the
Legislature.  Perhaps foremost among these are the
definition of crime and the determination of
punishment.  While these intrinsically legislative
functions are circumscribed by the constitutional
limits of Article I, Section 17, the validity of
enactments will not be questioned 'unless their
unconstitutionality clearly, positively, and
unmistakably appears.'"  People v. Wingo (1975) 14
Cal.3d 169, 174.

     A reviewing court determines whether a particular
penalty given "is so disproportionate to the crime for
which it is inflicted that it shocks the conscience and
offends fundamental notions of human dignity," thereby
violating the prohibition against cruel and unusual
punishment of the Eighth Amendment of the federal
Constitution or against cruel or unusual punishment of
Article I, Section 17 of the California Constitution.
People v. Cole (2004) 17 Cal.Rptr.3d 532, 595.  To do
so, courts "examine the circumstances of the offense,
including the defendant's motive, the extent of the
defendant's involvement in the crime, the manner in
which the crime was committed, and the consequences of
the defendant's acts.  People v. Cox (2003) 30 Cal.4[th]
916, 970.

5

Petitioner was motivated to murder in part by a desire to retrieve his property. Petitioner was directly and principally involved in the crime, which was committed suddenly and violently and which resulted in Jackson's death. The punishment imposed cannot be clearly deemed disproportionate to the crime of murder.

Furthermore, Petitioner has failed to adequately allege any facts that prove that Petitioner's sentence is cruel and unusual. All murderers face long prison terms and cautious parole boards. Prisoners' families all suffer distress from being separated from their family member. While these are difficult facts, they are imposed on all those who are convicted of murder. Under the high standard outlined above, the court cannot say that Petitioner's sentence shocks the conscience.

## II. THE BOARD DECISION WAS NOT ARBITRARY AND CAPRICIOUS

There is no evidence that the Board acted arbitrarily and capriciously, or otherwise failed to consider all the relevant factors. Although the Board ultimately decided to deny parole, the hearing transcript shows that it only did so after considering numerous factors, including many in Petitioner's favor, such as Petitioner's work toward a college degree, his work as a clerk in various departments, and his overall favorable mental health reports.

Consequently, because it duly weighed other consistent and competing factors, the Board's decision was not arbitrary and capricious.

## III. PETITIONER'S REMAINING ARGUMENTS

Petitioner contends that the Board has acted outside of its authority and has violated the

Legislature's intent in enacting the parole statute.
Petitioner also contends that the Board's practice of
regularly denying parole violates the doctrine of the
separation of powers.

Petitioner asks the court to wholly invalidate all
actions of another branch of government.  Aside from
the inherent difficulties such a request proposes,
Petitioner's statements are generalized and conclusory
and are given without supporting evidence.

The petition is denied.

Dated: December 14, 2004

Judge of the Superior Court

7

ENDORSED
F I L E D
San Francisco County Superior Court

MAR 2 4 2005

GORDON PARK-LI Clerk
BY: _____
              Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE CITY AND COUNTY OF SAN FRANCISCO

Department No. 22

IN THE MATTER OF THE APPLICATION )
OF                                )
                                  )
                                  )    WRIT NO. 5028
                                  )
JAMES CARLIN                      )    COURT NO. 2202749
                                  )
           Petitioner,            )
                                  )           Order
FOR A WRIT OF HABEAS CORPUS       )
_____)

        A petition for a writ of habeas corpus has been received.

        Petitioner is currently serving a sentence of 15 years to
life.  He complains that his continued incarceration is
unlawful, because the Board of Prison Terms has unlawfully
delayed his next parole hearing.  His last hearing was held on
December 15, 2003, at which time the Board denied him parole
"for one year."  No subsequent hearing has been held.  He was
informed that no hearing was likely to be held until late
summer, approaching two years since his last hearing.

        Petitioner filed this petition on January 27, 2005, along
with a request that it be decided in an expedited manner, a
request that was denied.  Subsequently, papers were filed
notifying the court that the Board of Prison Terms has scheduled
a hearing for Petitioner on May 16, 2005.

        Should Petitioner prevail on this writ, such that an order
to show cause is issued, the responding parties would have 30
days to file a return, pursuant to California Rule of Court
4.551(d).  The Petitioner would then have an additional 30 days
to file a denial (CRC 4.551(e)).  Therefore, the scheduling of
the hearing has effectively rendered Petitioner's claim as to
the scheduling of his hearing moot.

        Petitioner also complains that the Board fails to follow
the direction of Penal Code section 3041, that the Board
"normally" set a parole date at the first hearing.  Although
Petitioner is correct that Penal Code section 3041 indicates a
parole release date is "normally" set, that same section makes

it clear the prisoner need not be released until the Board
determines that the prisoner is suitable.   Calif. Pen. Code,
§ 3041(b).

The Board of Prison Terms has broad discretion in parole
matters.   In re Powell (1988) 45 Cal.3d 894, 901.   Its decision
will not be disturbed unless it has acted arbitrarily or
capriciously.   In re Ramirez (2001) 94 Cal.App.4[th] 549, 564.   In
reviewing a Board decision, due process only requires that there
be some evidence to support the Board's evidentiary findings.
Powell, *supra*, 45 Cal.3d p. 904; Ramirez, *supra*, 94 Cal.App.4[th]
at pp. 562-64.

Here, there is no evidence that the Board acted arbitrarily
and capriciously, or otherwise failed to consider the relevant
factors.   Although the Board ultimately decided to deny parole,
the hearing transcript shows that it only did so after
thoroughly considering numerous factors, including those in
Petitioner's favor.   The Board denied parole based on the crime
and the manner in which it was committed, and a belief that the
Petitioner needed to participate in more self-help programs and
needed to achieve more clarity as to how he got himself into
committing the crime he did.   Furthermore, the Board said
Petitioner was "very very close" to being suitable for parole,
but wasn't quite there.   It then gave examples of what
Petitioner could do to improve his chance at parole. It is clear
the Board made a decision based on Petitioner's individual case,
and with supporting evidence.

For the foregoing reasons, the petition for writ of habeas
corpus is DENIED.   Petitioner's request for appointment of
counsel is also DENIED.


_March 11, 2005_
Date

_Marc C. Ulloa_
Judge of the Superior Court



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

In re JAMES CARLIN,

    on Habeas Corpus.

A111328

(San Francisco County
Super. Ct. No. 4917)

FILED
Court of Appeal First Appellate District

SEP 1 5 2005

Diana Herbert, Clerk
By_____
             Deputy Clerk

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Reardon, Acting P.J., Sepulveda, J., and Munter, J.,* joined in the decision.)

Date: _____SEP 1 5 2005_____   ___REARDON, ACTING P.J.___ P.J.

---

* Judge of the Superior Court of the City and County of San Francisco assigned by the
Chief Justice pursuant to article VI, § 6 of the California Constitution.

Court of Appeal, First Appellate District, Division Four - No. A111328
S137548

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re JAMES CARLIN on Habeas Corpus

Petition for review DENIED.

SUPREME COURT
FILED

DEC 1 4 2006

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE
_____
Chief Justice

MICHAEL SATRIS, SBN 67413
MARGARET LITTLEFIELD, SBN 110938
Law Offices of Michael Satris
Post Office Box 337
Bolinas, CA 94924
Telephone:    (415) 868-9200
Facsimile:    (415) 868-2658
Email:        satris@earthlink.net

Attorney for Petitioner
JAMES CARLIN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMES CARLIN,

        Petitioner,

  v.

ROBERT WONG, Warden

        Respondent.

No. _____

**PROOF OF SERVICE**

    I am a citizen of the United States and a resident of Marin County.  I am over the age of eighteen years and not a party to the within above entitled action.  My business address is P.O. Box 337, Bolinas CA.

    On June 30, 2006, I served the within **PETITION FOR WRIT OF HABEAS CORPUS** on the interested parties in said action causing to be placed a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in a United States Post Office box addressed to the parties as follows:

Office of the Attorney General
Attn: Correctional Law Section
State of California
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102Counsel for
Respondent

Mr. James Carlin
San Quentin State Prison
P.O. Box C-22727
San Quentin  CA  94974
Petitioner

1    I declare under penalty of perjury that the foregoing is true and correct and that
2  this declaration was executed on June 30, 2006.
3
4                                        Sabine J_____
5                                     Sabine Jordan
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28