UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES CARLIN, | No. C 06-4145 SI |
| Petitioner, | **ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| ROBERT WONG, Acting Warden, | |
| Respondent. | |

## INTRODUCTION

James Carlin, an inmate at San Quentin State Prison, filed this petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the Court for consideration of the merits of the habeas petition. The Court finds that this matter can be resolved without oral argument, and therefore DENIES the request for oral argument and evidentiary hearing. (Docket No. 23). For the reasons discussed below, the Court GRANTS the petition for a writ of habeas corpus. (Docket No. 1).[1]

## BACKGROUND[2]

On June 10, 1980, a gun was stolen from Carlin's room in the Golden Eagle Hotel in San

---

[1] This Court has already rejected respondent's arguments that the petition is untimely, that petitioner has failed to state or establish any grounds for federal habeas corpus relief, and that the Court does not have subject matter jurisdiction, and thus will not address those contentions further. Furthermore, the Court has granted the petition based on the facts of this case and therefore need not reach petitioner's argument regarding system-wide bias against granting parole to inmates with life sentences.

[2] Except where otherwise cited, the background facts leading up to petitioner's conviction have been taken from the Probation Officer Report and Recommendation to the San Francisco Superior Court on October 10, 1980, exhibit three to respondent's Answer. Except where otherwise cited, the post-conviction background facts have been compiled from the correctional counselor's evaluation report from December 2003, exhibit seven to respondent's Answer.

1 Francisco, where Carlin had taken up temporary residence. Earlier that morning, Carlin left his room
2 at the hotel to buy a paper and cigarettes. He was approached by Curtis Jackson ("Jackson") and Robert
3 Evans ("Evans"), whom he did not know. They offered him drugs. Carlin declined but agreed to buy
4 them a small bottle of vodka. The men followed Carlin back to his room. Later, Carlin left and when
5 he returned, he found that the room had been rifled and several items were missing including the gun.
6 Answer Ex. 6 at 2. Carlin called the police and when they arrived, he told them that he believed Jackson
7 had stolen the gun. However, Carlin had no proof and could not provide the serial number of the gun,
8 so the officers left.

9 Carlin was afraid that the gun would disappear before the police could retrieve it and decided
10 to try to get it back himself. Answer, Ex. 4 at 16-17. Several of Carlin's acquaintances, Bob Migliorisi
11 ("Migliorisi"), Bernard Verrett ("Verrett"), and John Travis ("Travis"), offered to help Carlin retrieve
12 the gun if he paid them, to which Carlin agreed. Travis stated that Evans and Jackson were dangerous,
13 and related that Travis had two guns of his own in his room. Carlin, Travis, Verrett, and Migliorisi went
14 to Travis' room in the Golden Eagle Hotel, where Carlin and Verrett or Migliorisi each took one of
15 Travis' guns.[3] All four men then left the Golden Eagle Hotel and went to the Marconi Hotel to confront
16 Evans. Evans denied taking Carlin's gun and said that Jackson had stolen it. Evans joined the men as
17 they returned to the Golden Eagle Hotel to confront Jackson. Evans knocked on Jackson's door because
18 Jackson knew him and would let him in. After Evans identified himself, Jackson opened the door.
19 According to Carlin, Carlin was standing behind Evans with the gun in his hand. Evans jumped away
20 when Jackson opened the door, and Carlin started to step into Jackson's room when he thought he saw
21 a gun in Jackson's hand. Then he raised his own gun and, according to Carlin, the gun discharged
22 accidentally.[4] The single shot hit Jackson in the chest, killing him almost instantly. No weapon was
23 found on the victim. Witnesses indicated that at some point prior to killing Jackson, Carlin stated that

---

[3] According to Carlin, Travis told him that Travis and Verrett could not carry guns on the street because of their records, and therefore Carlin and Migliorisi held Travis' guns. The probation officer's version of the events states that Verrett and Carlin took Travis' guns. Answer, Ex. 3 at 6.

[4] At the parole hearing, Carlin's defense attorney, J. Tony Serra, stated by letter that the gun had a hair-trigger and that after the shooting, Carlin had told bystanders to call an ambulance. Answer, Ex. 4 at 69.

2

he did not want any trouble.

On October 10, 1980, after rejecting the prosecutor's pretrial offer of manslaughter, Pet. at 18; Answer, Ex. 1 at 8, a jury convicted Carlin of second degree murder and he was sentenced to seventeen years to life in prison.[5] His minimum eligible parole date was October 10, 1991. Answer, Ex. 4 at 1. On May 18, 1990, at Carlin's initial parole hearing, the Board of Parole Hearings ("Board") denied parole with recommendations that Carlin become disciplinary-free, participate in Narcotics Anonymous, and continue his present programming. Traverse, Ex. D at 234. From 1998 on, the Board's denials came with the same recommendation that Carlin remain disciplinary-free and participate in self-help or therapy programs. *Id.* at 197, 201, 206. The 1999 and 2000 correctional counselor's evaluations noted that "Carlin has complied with the [Board] recommendations and continues to be a model prisoner." *Id.* at 201, 206. In 2003, during his eleventh parole hearing, the Board again found him unsuitable and denied parole. Pet., Ex. 1 at 1. Carlin's habeas petition challenges this decision.

Carlin has some previous criminal history. In 1966 at age nineteen, Carlin was convicted of selling marijuana to undercover FBI agents. He was sentenced to two and a half years of state prison and was paroled the following year. In 1968 at age twenty-one, he was convicted of possession of hashish and was placed on probation for four years. In 1969 at age twenty-two, he was arrested for petty theft. He received a thirty-day suspended jail sentence and a $50.00 fine. In 1972, at age twenty-five, he was arrested for assault with a dangerous weapon and possession of marijuana. According to Carlin, whose account of this arrest is the only one available in the record, he was in a house when undercover enforcement officers raided it for drugs. Answer, Ex. 4 at 26-27. Officers found Carlin on the roof, holding a firearm which he pointed at the officers, then placed on the ground after the officers identified themselves and ordered him to do so. *Id.* For this incident, Carlin was also charged with false imprisonment of a police officer and providing false information to a police officer. Answer Ex. 7 at 2. All of the charges were combined and Carlin received a three month suspended sentence. *Id.* In 1979 Carlin was arrested for driving without a license, expired vehicle registration and receipt of stolen property, however, all charges were dismissed and Carlin was not arrested again until his arrest for the

---

[5] Petitioner's sentence was 15 years to life for second degree murder, plus two years for use of a firearm.

commitment crime. *Id*. During this time, Carlin also completed a BA degree in philosophy (1971) and became a skilled union carpenter (1972).[6]

Carlin has spent the last twenty-seven years in prison. He is now sixty-one years old. Carlin has been discipline-free in prison since 1986 and has never had any disciplinary charges involving violence.[7] Answer, Ex. 6 at 3. In the twenty-seven years Carlin has spent in prison, he has completed an AA degree from Patton Junior College, and has acquired additional vocational skills such as computer programming. At the time of the 2003 parole hearing, Carlin was working in the prison library. He has also worked as a clerk in the Jewish Chapel and a clerk in the art department, participated in Toastmasters, and worked as a tutor in the Laubach tutoring program teaching other inmates to read. Carlin has also been involved with self-help programs such as Alcoholics Anonymous, Narcotics Anonymous, Making it Work, Importance of Self-Responsibility, Self-Esteem, Moral and Social Accountability, Arts and Corrections, and Katargeo. Carlin has admitted to the commitment offense since the beginning, although he has always maintained that he did not intend to kill the victim. Carlin has continued to take responsibility and express remorse for his action since at least the 1985 psychological evaluation.[8] Traverse, Ex. C at 179.

Carlin's 2003 bid for parole was supported by a prison psychologist, a correctional counselor, and the District Attorney. The psychiatric evaluation stated that Carlin has been responsive to rehabilitation in prison, and that his record in prison demonstrates that his values, attitudes, and identifications have changed since he was a young man. Answer, Ex. 6 at 4. It further stated that

---

[6] The probation officer's report states that he received his degree in engineering in 1972, however, it was subsequently established that Carlin received a Bachelor's of Arts degree in philosophy in 1971. *See* Answer, Ex. 4 at 4, 78, 39.

[7] According to the rules violation report, in 1986 Carlin failed to turn down the volume of a television in his cell when ordered to do so by an officer. Answer, Ex. 19 at 1. The officer confiscated the television and noted that it did not belong to Carlin, but to his former cellmate who was no longer at the prison. *Id*. Carlin was cited with disobeying orders and possession of contraband. *Id*. Previous disciplinary notes involved similar behavior. *Id*. at 1-10.

[8] The 1989 psychological evaluation stated that Carlin "considers murder as the worse form of violence and deemed his killing the victim barbarous. He claimed to feel remorse for the act, and has been tormented as he tries to find a way to pay for the crime." Traverse, Ex. C at 177. The 2003 psychological evaluation stated that "Carlin continues to express remorse for his crime and he accepts full responsibility for his actions." Answer, Ex. 7 at 6.

4

1 Carlin's planned to return to work as a union skilled carpenter or working with computers, and that
2 reuniting with his family had a high degree of succeeding if Carlin is paroled to where his family lives.
3 *Id.* Carlin has remained in contact with his wife and daughter, other family members, teachers and
4 friends, and they have provided numerous letters expressing their support. The psychological evaluation
5 asserted that it was unlikely that Carlin would engage in criminal activity again, and that his risk for
6 future violence is very low. *Id.*

7 The correctional counselor's evaluation similarly stated that Carlin has "programmed positively
8 since his incarceration" and "would pose a low degree of threat to the community if he were released."
9 Answer, Ex. 7 at 6. This statement is consistent with every correctional counselor's evaluation since
10 1994, which have all rated Carlin's risk of danger to the public as moderately low to low. Traverse, Ex.
11 D at 195, 202, 206-07, 213, 216, 220, 223. Additionally, at the hearing, Deputy District Attorney
12 Cashman encouraged the parole board to give Carlin a date for parole. Answer, Ex. 4 at 70. Cashman
13 stated that he has been to many parole hearings and that there was only one other inmate he could recall
14 that has programmed as well as Carlin. *Id.*

15 On December 15, 2003, the Board found Carlin unsuitable for parole. The Board found that
16 Carlin posed an unreasonable risk of danger to society or threat to public safety based on the following:
17 (1) insufficient participation in beneficial "self-help programming"; (2) the Board's determination that
18 "the most recent psychological evaluation was not totally supportive of his release"; (3) Carlin's "failure
19 to profit from society's previous attempts to correct his criminality"; (4) Carlin's prior history of
20 criminality and misconduct; (5) his present lack of insight as to why, at the time of the commitment
21 offense, Carlin felt attracted to the character of a gangster; and (6) the timing and the gravity of the
22 commitment offense. *See id.* at 75-80.

23 Carlin sought relief in the California courts. The San Francisco Superior Court denied his
24 petition for writ of habeas corpus in 2004 in a short but reasoned order. *See* Pet. Ex. 1. The California
25 Court of Appeal and California Supreme Court summarily denied Carlin's petition for writ of habeas
26 corpus. *See* Answer, Exs. 3, 4. Carlin then filed his federal petition for a writ of habeas corpus,
27 asserting that the Board's denial violated his right to due process.

28

**STANDARD OF REVIEW**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Williams (Terry) v. Taylor,* 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. *See Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1126-27 (9th Cir. 2006). Because there was a reasoned state-court judgment rejecting Carlin's federal claims, the Court looks through the later summary denials of the California State Court of Appeals and of the California Supreme Court and analyzes whether the reasoned state judgment from San Francisco Superior Court was erroneous under the standard of § 2254(d). *See Hayward v. Marshall*, 512 F.3d 536, 541 (9th Cir. 2008).

**DISCUSSION**

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and, therefore, a right to due process in the parole suitability proceedings. *See Hayward*, 512 F.3d at 542-47 (Governor's reversal of the board's parole grant deprived petitioner of a constitutionally protected liberty interest); *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007); *Sass*, 461 F.3d at 1127-28; *see also Board of Pardons v. Allen*, 482 U.S. 369 (1987); *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

The Ninth Circuit has held that "the Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record,' or is 'otherwise arbitrary.'" *Irons*, 505 F.3d at 851

6

(quoting *Superintendent v. Hill*, 472 U.S. 445, 457 (1985)). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" *Sass*, 462 F.3d at 1129 (quoting *Hill*, 472 U.S. at 457). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the Board. *Sass*, 461 F.3d at 1128 (quoting *Hill*, 472 U.S. at 455-56).

When assessing whether a state parole board's suitability determination was supported by "some evidence," the Court frames its analysis by the statutes and regulations governing parole suitability determinations in the relevant state. *Irons*, 505 F.3d at 850. California law provides that prisoners serving an indeterminate life sentence, like Carlin, become eligible for a parole date after serving minimum terms of confinement required by statute. *See In re Dannenberg*, 34 Cal. 4th 1061 (2005); *see also* Cal. Penal Code § 3041(a). At that point, the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for" the prisoner. Cal. Penal Code § 3041(b). Regulations promulgated pursuant to California Penal Code Section 3041(a) state that "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal.Code Regs. tit. 15, § 2402(a). The Board decides whether a prisoner is too dangerous to be suitable for parole by applying factors it has set forth in the California Code of Regulations.[9] *Hayward*, 512 F.3d at 543.

---

[9] The following factors tend to show unsuitability for parole: (1) the prisoner committed the offense in an especially heinous, atrocious, or cruel manner; (2) the prisoner has a previous record of violence; (3) the prisoner has an unstable social history; (4) the prisoner has committed sadistic sex offenses; (5) the prisoner has a history of mental or psychological problems; and (6) the prisoner has engaged in serious misconduct while in prison. Cal. Code Regs. tit. 15 § 2402(c). Factors that tend to show suitability for parole include: (1) the prisoner has no juvenile record; (2) the prisoner has a stable social history; (3) the prisoner has shown signs of remorse; (4) the prisoner was motivated to commit the crime out of stress; (5) the prisoner suffered from Battered Women's Syndrome; (6) the prisoner lacks a significant criminal history; (7) the prisoner's age reduces the probability of recidivism; (8) the prisoner has realistic plans for release; and (9) the prisoner's behavior in prison indicates and ability to function within the law upon release. *Id*. § 2402(d).

7

The Court must review the record to determine whether the state court decision holding that the parole board's findings were supported by "some evidence" constituted an unreasonable application of the "some evidence" principle articulated in *Hill*. *Irons*, 505 F.3d at 850. The Ninth Circuit recently recognized in *Hayward* that California law makes clear that the "'findings that are necessary to deem a prisoner unsuitable for parole,' are not that a particular factor or factors indicating unsuitability exist, but that a prisoner's release will unreasonably endanger public safety." *Hayward*, 512 F.3d at 543 (citations omitted). Accordingly, the test here is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that a parolee's release unreasonably endangers public safety. *Id.*

In applying this standard, the Court finds instructive the Ninth Circuit's recent decision in *Hayward v. Marshall*. In *Hayward*, the Ninth Circuit held that the Governor's reversal of the parole board's determination that a prisoner was suitable for parole was unsupported by any evidence that his release would threaten public safety. *Hayward*, 512 F.3d at 547. The court determined that the Governor's findings were either unsupported by evidence in the record, *id* at 546, or were based on unchanging factors which occurred twenty-seven to fifty years ago and did not constitute evidence that the prisoner would pose a danger to public safety if released from prison, *id* at 545-47. These unchanging factors were Hayward's criminal history, his unstable social history including gang involvement, and the gravity of his commitment offense. *Id*.

The facts here are strikingly similar to the facts of *Hayward*. Both prisoners were convicted of second degree murder and sentenced to fifteen or seventeen years to life,[10] both have served their minimum sentences and have been incarcerated for close to thirty years with exemplary prison records; both have stopped using drugs, have participated in self-help programs and taken academic courses; and both are now in their sixties, have viable parole plans and the full support of their families. *See Hayward*, 512 F.3d at 538-39. However, unlike Hayward, Carlin has never had a major disciplinary violation in prison and his prison record has been free of any infractions for ten years longer than that of Hayward. *See Hayward*, 512 F.3d at 538. Furthermore, Carlin has taken responsibility for his crime

---

[10] Carlin was sentenced to fifteen years to life for second degree murder and received an additional two-year sentence for use of a firearm.

8

since the very beginning, whereas Hayward did not admit responsibility until he had spent thirteen years in prison. *Id*. Finally, Carlin's psychological reports have indicated for years that his risk of danger to society is low to below average, whereas Hayward's risk of danger to society was determined to be low to moderate. *Id*. at 544.

After careful review of the record in this case, and with *Hayward* as guidance, the Court holds that the San Francisco Superior Court unreasonably applied the "some evidence" standard when it concluded that the Board's denial of parole was justified. To the contrary, there is no evidence in the record that supports a determination that Carlin's release would unreasonably endanger public safety.

## I. A number of Board findings have no evidentiary support

Some of the findings on which the Board relied to find Carlin unsuitable for parole have no evidentiary support in the record. First, the Board asserted that Carlin has not sufficiently participated in self-help programs. However, the Board shortly thereafter listed eight different self-help programs in which Carlin has participated in the past, and some in which he continues to participate. The 2003 corrections counselor's evaluation indicates that Carlin has actually participated in eleven different self-help programs, beginning in 1990. These include Narcotics Anonymous in which Carlin participated from 1990-1998, and Alcoholics Anonymous from 1998-2003.[11] Furthermore, the Board indicated that although the Board would like Carlin to gain more insight into the causative factors of his crime, if further self-help was unavailable, it "wouldn't hold it against him," which suggests Carlin's self-help activities have actually been sufficient.

Second, the Board stated that the most recent psychological evaluation was not totally supportive of his release. The Board referred to a statement in the evaluation that Carlin does not have insight as to why he was attracted to the character of a gangster thirty years ago, at the time of his commitment offense. Answer, Ex. 4 at 77. However, while the evaluation noted this lack of insight, it states that Carlin's risk for future violence is very low, that it is unlikely that Carlin would engage in criminal

---

[11] Under the self-help category, the corrections counselor also noted that Carlin completed his Associate of Arts degree in 1998 and has since taken additional academic courses including Philosophy, History, Sociology, Religious Studies, American Government, U.S. History, and Introduction to Film Art Appreciation.

9

activity again, and that there were no psychiatric reasons for Carlin not to be paroled. *Id.*, Ex. 6 at 2-4. The psychological evaluation was clearly supportive of Carlin's release, as has been every psychological evaluation since 1992. *See* Traverse, Ex. C at 164, 167, 170-72, 175.

Third, the record does not support the Board's statement that Carlin "failed to profit from society's previous attempts to correct his criminality." *Id.*, Ex. 4 at 76. Carlin was convicted at age nineteen for selling marijuana to an undercover FBI agent. Carlin stated during his parole hearing that he learned his lesson from that incident and never sold drugs again. Carlin did not have any further arrests for selling drugs, although he continued to use them. *See id.*, Ex. 3 at 1-3. Carlin stated that after his 1972 conviction for possession of marijuana, he stopped using drugs and has not used drugs since. *See* Traverse, Ex. C at 168 (1996 psychological evaluation stating "it should be pointed out that the inmate had been essentially free of alcohol and marijuana use for the past 16-years prior to the instant offense").[12] Indeed, Carlin apparently removed himself from the drug culture, got married, had a child and remained arrest-free for almost eight years until he was arrested for vehicle code violations and receipt of stolen property. These charges, however were subsequently dropped due to lack of evidence. Carlin's "profit" may have been incremental, but the record shows that he did respond to society's attempts to correct his criminality.

Furthermore, whether or not Carlin responded adequately to these attempts thirty or more years ago has no bearing on his present suitability for parole. As discussed below, the Board's reliance on this unchanging factor does not constitute evidence that Carlin would pose a danger to public safety if released from prison. *See Hayward*, 512 F.3d at 545. The record shows that twenty-seven years in prison has rehabilitated Carlin. The 2003 psychological report stated that "Carlin's record in prison demonstrates that his values, attitudes and identifications have changed since he was a young man and "it is unlikely that he would engage in criminal activity again." Answer, Ex. 6 at 4; *see also* Traverse, Ex. D at 195 (2002 evaluation stating, "Carlin has programmed positively since his incarceration"); *id.* at 202, 206 (2000-2001 evaluations stating, "Since his reception at CDC, Carlin has made an exceptional

---

[12] The evaluation noted that at the time of the commitment offense, Carlin had had a small amount of alcohol, and was apparently on a narcotic pain-killer which had been prescribed for a right-arm injury he suffered in an auto accident. *Id.* at 166

10

adjustment to incarceration. . . he has maintained professional relationships with staff and the inmate population. He is intelligent, well spoken and shows a genuine concern for his fellow inmates. He has used his time in a productive manner. . . ."); *id.* at 212 (1998 evaluation stating, "Carlin has become an above average model prisoner. He exceeds in his work efforts, has gained work skills as a draftsman and in computer operations, and continues to excel academically. He is a quiet, thoughtful and well-spoken person who shows respect not just to staff but to his fellow inmates."); *id.* at 215 (1997 evaluation stating, "Carlin seems to have a good attitude and continues to utilize his time in prison positively and constructively."); *id.* at 220 (1996 evaluation stating, "Carlin's overall pattern of behavior since his last BPT appearance . . . is considered above average. He has received excellent work evaluation reports. He is commended for his efforts in regards to substance abuse . . . . he continues to utilize his time in prison positively and constructively."); *id.* at 223 (1995 evaluation stating, "Carlin's adjustment to a correctional setting continues to be above average as exhibited by his positive programming."); *id.* at 228 (1994 evaluation stating, "Carlin's overall pattern of behavior . . . is considered above average. He has received excellent work reports from all of his assignments. He is commended for his efforts as a volunteer in tutoring inmates . . . . He continues to utilize his time in prison positively and constructively.").

In sum, there was no evidence to support the Board's findings that Carlin has not sufficiently participated in self-help programs, that the most recent psychological evaluation was not supportive of his release, and that Carlin has failed to profit from society's attempts to correct his criminality. Accordingly, the Court holds that the Board improperly relied on these grounds to find Carlin unsuitable for parole.

**II.  The remaining Board findings do not constitute "some evidence" that Carlin's release will unreasonably endanger public safety**

The remaining grounds on which the Board relied are (1) Carlin's prior history of criminality and misconduct, (2) his lack of insight as to why, at the time of the commitment offense, Carlin felt attracted to the character of a gangster, and (3) the timing and gravity of the committing offense.

The Ninth Circuit has cautioned that "a continued reliance on an unchanging factor such as the

circumstances of the commitment offense, pre-conviction criminal history, or other past conduct, might in some cases result in a due process violation at some point." *Hayward*, 512 F.3d at 545 (citing *Biggs v. Terhune*, 334 F.3d 910, 916 (9th Cir. 2003)). *Biggs* upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." *Id.* at 916. The Ninth Circuit later noted that "[t]he commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison." *Hayward* 512 F.3d at 545-46 (citation omitted) (unchanging factor of the gravity of petitioner's 25 year-old commitment offense had no predictive value regarding his suitability for parole in light of petitioner's rehabilitation by education and conduct during his almost thirty years in prison); *cf. Rosas*, 428 F.3d at 1232 (nature and circumstances of prisoner's crime, along with his psychiatric reports, constituted evidence with sufficient reliability to support board's denial of parole and deferment of next parole suitability hearing for 5 years). Finally, case law strongly suggests that once an inmate has served his minimum sentence, the value of the commitment offense decreases as an indication of unsuitability for parole. *See Hayward*, 512 F.3d at 547 (noting that "in all cases in which the Ninth Circuit has held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offence comports with due process, the decision was made before the inmate had served the minimum number of years required by the sentence").

Here, the Board's remaining three grounds for finding Carlin unsuitable for parole are based on unchanging factors that do not constitute evidence that Carlin would pose a danger to public safety if released from prison. First, the Board relied on Carlin's "prior history of criminality and misconduct." Answer, Ex. 4 at 76. Carlin's prior criminal history, which occurred thirty or more years ago, consists of non-violent violations of the law and provides no basis for a conclusion that Carlin currently poses

a risk to public safety.[13] "Time may attenuate the taint of certain prior misconduct," *Hayward*, 512 F.3d at 545-46, and this is particularly true with respect to Carlin's non-violent misconduct which occurred prior to his commitment offense when Carlin, now sixty-one years old, was eighteen to twenty-five years of age. *See id.* (finding that prisoner's many prior arrests which occurred thirty or more years ago do not support conclusion that prisoner is a danger to society).

Second, the Board found Carlin unsuitable for parole based on the finding in the 2003 psychology report that Carlin lacked insight as to why, at the time of the commitment offense, he was attracted to the character of a gangster. Answer, Ex. 4 at 77, 78, 80. The fact that Carlin does not know why he identified with a gangster thirty years ago does not provide any evidence that his current release would pose an unreasonable risk of danger to society. The 2003 psychology report also noted that Carlin feels profound guilt over the murder, that he realizes that gangster character was a bad choice of identification, and that the gangster character no longer appeals to him. Carlin has not engaged in impulsive behavior since his 1986 prison infractions. His prison record of continued education, self-help courses, and teaching fellow inmates indicates that Carlin no longer identifies with the gangster persona. Furthermore, the evaluating psychologist found that Carlin's lack of insight is only partial, Carlin's risk for future violence is very low, and there are no psychiatric reasons for Carlin not to be paroled; these findings are consistent with fifteen years of psychological evaluations. *See, e.g.*, Traverse, Ex. C at 162 (2000 evaluation stating, "After 20 years of incarceration he seems to be as much rehabilitated as he is going to be. . . . it is not likely that he would engage in criminal action again . . . . under parole conditions I believe that he will respond very well and he could become a self supportive member of society."); *id.* at 164 (1998 evaluation stating, "There is no psychiatric reason why Mr. Carlin should be denied parole."); *id.* at 167 (1996 evaluation stating, "the inmate demonstrates remarkable tranquility and stability . . . . He continues to demonstrate growth, maturity, and ability to learn from past experience and that he continues to donate his time and energy to helping others . . . .

---

[13] Although petitioner was convicted in 1972 at age 25 of assault with a dangerous or deadly weapon, the Board did not have the police report for this incident. Answer, Ex. 4 at 31. The only evidence in the record pertaining to that incident is Carlin's account at the hearing of being in a house with drugs that was raided by plain-clothed law enforcement officers. He was found on the roof holding a weapon which he pointed at the officers, but put down when the officers identified themselves and asked him to do so. *See* Answer, Ex. 4 at 26, 29.

His violence potential at the present time is judged to be below average for this population."); *id*. at 170 (1995 evaluation stating, "Mr. Carlin has no connection to or identification with his former lifestyle. Mr. Carlin's psychological examination results revealed no potential for violence. His violence potential outside a prison setting should be viewed as 'below average.'"); *id.* at 171-72 (1994 evaluation stating, "Mr. Carlin has no connection to or identification with his former lifestyle. His psychological examination revealed no potential for violence and he has the capacity to make a significant contribution as a citizen to the external community. Therefore, his potential for violence in the community is average to below-average."); *id.* at 175 (1992 evaluation stating, "As far as violence potential in the community is concerned, the subject is evaluated as average for the population and decreasing in this potential.").

Third, the Board relied "primari[ly] and paramount[ly]" upon the timing and gravity of the commitment offense. Answer, Ex. 4 at 75. The Board stated that Carlin was unsuitable for parole because the commitment offense "was carried out in a vicious and brutal manner," "in a dispassionate and calculated manner," "in a manner which demonstrates an exceptionally insensitive disregard for human suffering," and "the motive was inexplicable and very trivial in relationship to the offense." *Id*. at 75-76. However, the Court concludes that Carlin's commitment offense, which occurred twenty-seven years ago, cannot demonstrate that Carlin's release will pose an imminent danger to public safety. *See Hayward,* 512 F.3d at 546-47 ("While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances – after nearly two decades of incarceration hearings and half a dozen parole suitability hearings – violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the 'some evidence' standard.") (citing *Rosenkrantz v. Marshall*, 444 F. Supp. 2d 1063, 1084 (C.D. Cal. 2006)).

In *Hayward*, one of the bases for the Governor's reversal of the board's grant of parole was the gravity of Hayward's commitment offense, which the Governor found particularly heinous. *Hayward,* 512 F.3d. at 546. Hayward, along with members of his motorcycle gang, confronted a man in a bar who had slapped or battered and attempted to rape Hayward's girlfriend. *Id*. at 538. The confrontation became physical and Hayward ultimately killed the man by stabbing him twelve times. *Id.* The Ninth Circuit found that the unchanging factor of the gravity of the commitment offense had no predictive

14

value regarding Hayward's suitability for parole because Hayward had been incarcerated for almost thirty years, he had a positive prison record, his crime was provoked by the attack on his girlfriend, and the parole board had previously granted Hayward a parole date, which was also reversed by the Governor. *Id*. at 547. The Ninth Circuit noted, however, that "certain conviction offenses may be so 'heinous, atrocious or cruel' that a prisoner's due process rights might not be violated if he or she were denied parole solely on the basis of the nature of the conviction offense" and confined its holding to the facts of the case and the nature of Hayward's particular conviction offense. *Id*. at n.10. In light of the similarities between Carlin's and Hayward's fact situations, Carlin's less violent and more laudatory record, and Carlin's commitment crime being no more "heinous, atrocious, or cruel" than that of Hayward, this Court finds the holding in *Hayward* instructive in the instant case.

Carlin is now sixty-one years old. The 2003 parole hearing was his eleventh. Carlin has been incarcerated for over twenty-seven years, well beyond his minimum sentence of seventeen years.[14] With the exception of two non-violent infractions in 1986, Carlin has had an exemplary record of conduct during this time. Given that (1) the commitment offense was Carlin's only act of violence prior to his incarceration, (2) he has never had a disciplinary charge involving violence while in prison, (3) Carlin has rehabilitated himself through continued education, learning vocational skills, and participating in self-help courses, (4) Carlin has viable plans for work and support from his family after his release, (5) since 1989, the psychological evaluations have indicated continuously that Carlin is non-violent and his release on parole would pose little risk to the public, (6) since 1994, the evaluation reports by correctional counselors have indicated continuously that Carlin would pose a low degree of threat to the public if released, (7) and the District Attorney supports Carlin's release, the Court holds that the Board violated Carlin's due process rights by relying on the unchanging factor of his commitment crime to determine that his release would pose an unreasonable risk of danger to society. *See Hayward* 512 F.3d at 546 ("After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil.") (citing *Rosenkrantz*, 444

---

[14] As noted above, in all the cases in which the Ninth Circuit has deemed a parole denial based entirely upon the commitment offense as comporting with due process, the inmate had not yet served his minimum sentence. *See Hayward*, 512 F.3d at 547.

15

1 F. Supp. 2d at 1084).[15]

2     In sum, the Court finds that the Board violated Carlin's due process rights by relying on
3 unchanging factors that do not constitute evidence of Carlin's present threat to society if released, and
4 by relying on factors without any evidentiary support in the record. For the same reasons, the Court
5 finds that the San Francisco Superior Court unreasonably applied the "some evidence" standard to
6 Carlin's petition. To meet the "some evidence" standard, the superior court only cited the Board's
7 findings regarding the unchanging factors of the commitment offense, the motive, and Carlin's past
8 criminal history. *See* Answer, Ex. 12 at 2-4. As the superior court noted, it is not bound by Ninth
9 Circuit decisions that address due process concerns of continued reliance upon unchanging factors. This
10 Court, however, must follow Ninth Circuit precedent. Under *Biggs* and *Hayward*, these findings do not
11 constitute "some evidence" that Carlin poses an unreasonable threat to public safety. Thus, the Superior
12 Court's conclusion that the reports provided some evidence to support the Board's determination that
13 Carlin was not suitable for parole was an unreasonable application of the "some evidence" standard
14 articulated in *Hill*. Accordingly, the Court concludes that the denial of parole violated Carlin's due
15 process rights and hereby GRANTS the petition for writ of habeas corpus.

21 ///

---

[15] In its discussion of the commitment crime, the Board stated that Carlin's motive was "inexplicable and trivial." Answer, Ex. 4 at 76. However, like the crime itself, the unchanging factor of Carlin's motive for committing the crime does not provide a factual basis for the Board to conclude that Carlin's release from prison poses a risk to public safety. *See Hayward*, 512 F.3d at 547 (Governor's reliance on the unchanging factor of prisoner's motive for committing the crime violated prisoner's due process rights). Furthermore, the record does not support the Board's finding that the motive was inexplicable and very trivial. The record is clear that Carlin's motive was to retrieve a gun he believed the victim had stolen from him, and that he carried a gun, albeit unwisely, because he believed the victim was armed and dangerous. That the Board does not believe the crime was justified does not mean that the motive was unintelligible or trivial. Every murder without an affirmative defense is unjustified as a matter of law.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS the petition for writ of habeas corpus. (Docket No. 1) and DENIES petitioner's request for oral argument and evidentiary hearing (Docket No. 23). **The Court directs the parties to file briefs no later than March 31, 2008 regarding the appropriate remedy**.

**IT IS SO ORDERED.**

Dated: March 17, 2008

SUSAN ILLSTON
United States District Judge